FILED

2017 Mar-31  AM 11:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| MARTHA S. MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  5:14-cv-02230-SGC |
| | ) | |
| VERIZON WIRELESS (VAW), LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Defendant Verizon Wireless (VAW), LLC's motion for summary judgment.  (Doc. 28).  In her complaint, Plaintiff Martha Moore asserts four claims: (1) discriminatory termination on the basis of a disability in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"); (2) retaliatory termination on the basis of a disability in violation of the ADA; (3) interference with a right conferred by the Family and Medical Leave Act of 1993, 29 U.S.C. § 2611 *et seq.* (the "FMLA"); and (4) retaliatory termination in violation of the FMLA.  (Doc. 1).  Plaintiff responded to the motion for summary judgment (Doc. 33), and Defendant replied.  (Doc. 37).  This matter is now ripe for review.  The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  (Doc. 17).  For the reasons that follow, the court finds Defendant is entitled to summary judgment on all counts.

## I.     RELEVANT FACTS

Plaintiff started working for Defendant in 2007 as a supervisor in the customer service department.  (Doc. 30 at 3).  In that role, Plaintiff supervised customer service representatives who took and answered calls regarding products, billing, and service issues.  (*Id.*).  Plaintiff was

responsible for monitoring the calls of her subordinates, coaching them on their handling of customer concerns, and providing day-to-day operational maintenance.  (*Id.* at 4).

Plaintiff reporteded directly to an associate director.  (*Id.* at 5).  Defendant rotates teams of employees among the associate directors every six months, so during the time Plaintiff worked for Defendant, she was assigned to several different associate directors.  (*Id.*).  The associate directors report to Director Jeremiah Knight.  (*Id.*).

During her employment with Defendant, Plaintiff applied for and was granted several leaves of absence pursuant to the FMLA as a result of various health conditions.  (*Id.* at 7).  Plaintiff was granted FMLA leave in June 2008, March 2009, June 2009, August 2010, and September 2010.  (*Id.*).

Plaintiff also applied for and was granted leave from July 13, 2011, through September 4, 2011.  (*Id.*).  Prior to beginning her leave in July 2011, Plaintiff handled a call on June 21, 2011.  (*Id.*).  Defendant alleges Plaintiff "treated the store representative as someone who was trying to work outside of policy instead of treating her as a peer."  (*Id.*).  Upon her return from FMLA in September 2011, Plaintiff resumed her role as a supervisor.  (Doc. 30 at 7-8).  At that time, Plaintiff was provided with an accommodation allowing her to sit down rather than walking the floor while supervising her subordinates.  (*Id.* at 8).

On September 8, 2011, Plaintiff handled a customer call.  (*Id.*).  Plaintiff used a phrase which Michelle Campbell, her associate director at the time, considered inappropriate.  (*Id.*).  Campbell issued a written warning on the basis of the June 21, 2011 and September 8, 2011 calls.  (*Id.*).  Plaintiff states this warning—at least as it related to the June 2011 incident—had "expired" by the time of her termination.  (Doc. 33 at 12).

Plaintiff next took approved FMLA leave for a broken wrist from February 12, through 29, 2012.  (*Id.* at 9).  While on leave, Plaintiff called in and spoke every week with David Brandi, her associate director at the time.  (*Id.*).  Plaintiff and Brandi would discuss work matters, including disciplinary actions and customer-related questions.  (*Id.*).  On one occasion, Moore called into an office meeting and was asked to drop off the call because she was on leave. (*Id.*).

When Plaintiff returned from leave on February 29, 2012, she resumed the same position, responsibilities, and title.  (*Id.* at 10).  Upon her return, Plaintiff reported to Associate Director Raquel Insignares.  (*Id.*).  Plaintiff applied for and was granted an accommodation in the form of a "Dragon" voice automated system so that she would not be required to type.  (*Id.*).

Plaintiff complains of three incidents involving Brandi.  First, Brandi failed to return Plaintiff to the payroll system following her return from leave because he mistakenly believed Insignares had done so.  (*Id.*).  This resulted in the delay of a paycheck Plaintiff should have received on March 14, 2012.  (*Id.*).  Verizon corrected the error immediately once it became known, and Plaintiff was issued a check five days after her normal payday.  (*Id.*).  However, Plaintiff viewed these events as the result of Brandi's lack of knowledge about his job responsibilities.  (*Id.*).  Second, Plaintiff complains that sometime in March 2012, co-workers brought Plaintiff some ice for her wrist.  (*Id.*).  While Plaintiff and her coworkers were talking, Brandi walked by and said, "What's this? What's this? Well, she's just got everybody waiting on her hand and foot."  Plaintiff viewed this as a slight against her but concedes Brandi may have been joking.  (Doc. 30 at 10).  Finally, after Plaintiff was promoted to a supervisor in technical support on June 10, 2012, she was told that Brandi expressed the opinion that Plaintiff was not

qualified for the job during a meeting in which several associate directors were discussing who would be awarded this position.  (*Id.*).

From September 30, 2012, until her termination, Plaintiff was again assigned to report to Insignares.  (Doc. 30 at 12).  Moore does not dispute that she had a positive relationship with Insignares and requested to work with her.  (*Id.*).

In December 2012, Plaintiff began to suffer migraine headaches.  (Doc. 33 at 5).  Her migraines caused sensitivity to light, nausea, and intense pain.  (*Id.*).  It was difficult for Plaintiff to move during a migraine, and sudden bouts of nausea would occasionally require her to leave the work floor.  (*Id.*).  Insignares denies that she and Plaintiff discussed Plaintiff's headaches in December 2012.  (Doc. 31-8 at 8).  Insignares states she was only ever aware that Plaintiff suffered headaches, not specifically migraines, and did not become aware of the headaches at all until after January 11, 2013.  (*Id.* at 7-8).

In the morning of January 11, 2013, Plaintiff took a call (the "January 11 call") from a customer who was upset because a local store had not provided a "loaner" phone for him to use while his own phone was not working.  (Doc. 30 at 13).  The customer requested to speak to a supervisor, and the call was transferred to Plaintiff.  (*Id.*).   Plaintiff and the customer then engaged in an argument about whether he would have to pay the shipping cost for Saturday delivery of a replacement phone.  (*Id.*).  The parties dispute whether Plaintiff properly sought assistance from peers or supervisors during the call.  (Doc. 31-2 at 19, 23).

During the January 11 call, both the customer and his wife spoke with Plaintiff.  (Audio Recording, *filed* January 4, 2016; *see* Doc. 29). The customer stated he was upset because without a functional phone, he would lose his job.  (*Id.*).  Plaintiff can be heard blaming the customer for not ordering a replacement in time to get it over the weekend.  (*Id.*).  When

4

speaking to the customer's wife, she stated, "I need to make something clear to you … That's why we're in this position, is based on your husband's decision."  (*Id.* at 6 minutes, 53 seconds).

The customer asked to speak to a supervisor above Plaintiff's level of authority, but Plaintiff would not transfer him during the call.  (Doc. 31-2 at 19).  Plaintiff states this is because no appropriate supervisor was present, but Defendant asserts she could have excused herself and allowed a peer or an associate director to handle the call; she could also have initiated a "call-back" to arrange for the customer to speak with someone else.  (*Id.*; Doc. 37 at 2).

Plaintiff repeatedly insisted to the customer that if he wanted Saturday delivery of a replacement phone, he would have to pay a $14.99 shipping fee because, although Defendant provided free standard shipping, the call was taking place on a Friday.  To get the phone there on Saturday would require expedited shipping, which Plaintiff asserted was not within her discretion to arrange for free.  (Doc. 31-2 at 21).  Plaintiff maintains she did not have discretion to grant free overnight shipping for the customer because a company directive prohibited supervisors from waiving special shipping fees.  (*Id.*).

Two recordings of the January 11 call exist.  In the shorter recording, it appears Plaintiff hung up on the customer because the sound cuts off during the conversation.  (Doc. 33 at 6-7).  In a longer version, which was not submitted into evidence, Plaintiff can be heard continuing the conversation as the customer hands his phone to his wife.  (*Id.* at 7).  Plaintiff can be heard apologizing to the customer for the problems, completing his order, and issuing an expected delivery date for the replacement phone.  (*Id.*).  Plaintiff claims it is clear from the longer recording that the customer hung up.  (*Id.*).  Defendant's position is that it sounds as though Plaintiff hung up on the customer in both versions of the call and that Plaintiff was confronted with the longer version during a meeting with Insignares and conceded it sounds like she hung

up on the customer.  (Doc. 37 at 2).  The parties dispute whether it was the longer recording or the shorter recording which Insignares played for Plaintiff during their meeting on January 14, 2013.  (Doc. 34-1).  Plaintiff states she emphasized to Insignares during their meeting that she did not hang up on the call and that her tone would have been better if she had not been suffering from a "full-blown" migraine.  (*Id.*).  Plaintiff told Insignares, "I barely knew what my own name was, I was in so much pain."  (Doc. 31-2 at 35).  Following the January 11 call, the customer called again and reported he was unhappy.  (Doc. 31-2 at 24).  The customer stated in his follow-up that Plaintiff had hung up on him.  (*Id.*).

Plaintiff had already begun to see a physician about her condition by the time of the January 11 call.  (Doc. 33 at 5) (stating Plaintiff started seeking medical assistance for her migraines in "late 2012").  Plaintiff had an appointment with her doctor on January 9, 2013, but had to cancel it because she was told that a work meeting was mandatory.  (*Id.*).  Plaintiff alleges Insignares was aware of the doctor's appointment and the reason for it and was told she would have to rearrange it because of the meeting.  (Doc. 31-1 at 36).  Plaintiff states she was told by Insignares, "This is a mandatory meeting, and you have to be there."  (Doc. 33 at 5).  Plaintiff alleges the January 11 call would have been handled better if she had been allowed to attend her doctor's appointment because her migraines would have been treated.  (*Id.* at 5).

Defendant states, on the basis of Insignares's testimony, that Plaintiff was not told she had to attend the meeting on January 9, 2013.  (Doc. 37 at 1).  Thus, Defendant denies Plaintiff's assertion that it prevented her from going to her doctor's appointment and getting the help she needed for her migraines.  Further, Defendant denies whether going to the doctor would have changed Plaintiff's behavior on the January 11 call.  (*Id.* at 2).

Defendant uses a Code of Conduct which sets out policies governing employee behavior. (Doc. 30 at 5). The Code of Conduct includes a standard of conduct that provides, "Verizon Wireless employees are required to treat customers, fellow employees, and vendors with respect, dignity, honesty, fairness, and integrity." (*Id.* at 6). The Code of Conduct also states, "You are accountable for your role in the delivery of [fair, honest, and respectful] service." (*Id.*). Plaintiff was familiar with the requirements and understood the rules to prohibit employees from being rude or disrespectful to customers, speaking to a customer in a disrespectful tone, or ending a call while a customer is speaking. (*Id.*). Plaintiff concedes that hanging up on a customer would be grounds for disciplinary action of some kind. (*Id.*). Plaintiff concedes she spoke over the customer at several points during the call, blamed the customer for failing to order a phone during an earlier call, and refused to provide him with a complaint number even though she could have. (Doc. 31-2 at 17-18, 19). But Plaintiff states she was "in the thralls of a full-blown migraine and could barely see" during the call. (Doc. 33 at 6). She states she did not have discretion to offer the customer free shipping or waive his fees and that no supervisor was available to ask about waiving the fees during the call. (*Id.*). Plaintiff states she tried to reach the supervisor she believed was on duty but did not have the authority to transfer calls to a higher level. (*Id.*).

Defendant alleges Plaintiff's conduct on the January 11 call was a sufficient reason for her termination. (Doc. 37 at 5) ("Insignares averred that she reviewed the customer call on the same date of the call and determined Plaintiff's conduct warranted termination."). Insignares testified that Defendant has a "zero tolerance" policy with regard to hanging up on customers. (Doc. 31-8 at 21). Insignares indicates this policy applies to all levels of employees. (*Id.*). Plaintiff has offered evidence of several employees who hung up on customers or were otherwise

rude and against whom no "zero tolerance" policy was enforced.  (Doc. 31-2 at 30-32, 36-37, 44-45).

On January 11, 2013, at 12:43 p.m., Supervisor Luke Crane sent an email to Insignares informing Insignares that the customer involved in the January 11 call had called again to report that Plaintiff was rude and hung up on him.  (Doc. 31-8 at 58).  Crane's email appears to have been copied to several people.  (*Id.*).  In his email, Crane invites Insignares to meet and discuss in further detail and he states, "We reviewed . . . Martha's interaction with the customer and there is some definite opportunity there."  (*Id.*).

Defendant states Insignares met with Director Jeremiah Knight and reviewed the January 11 call before Insignares met with Plaintiff about it.  (Doc. 30 at 15).  Insignares testified her meeting with Knight likely took place on the same day as the call.  (*Id.*).  During their meeting, Knight agreed with Insignares that the call warranted termination.  (*Id.*).  Knight advised Insignares to discuss the call with Human Resources Manager Bridgette Wilder (also referred to in the record as Bridgette Beasley) before meeting to make a final decision about Plaintiff's termination.  (*Id.*).  Defendant states Insignares and Wilder met the same day and, after a review of the call and Plaintiff's disciplinary history, agreed that Plaintiff's handling of the call warranted termination.  (*Id.*).

Plaintiff and Insignares met on January 14, 2013.  (Doc. 34-1 at 2).  During their meeting, Insignares informed Plaintiff that she, Insignares, had been told Plaintiff was rude during a customer call.  (*Id.*).  Plaintiff states she was not "intentionally rude" but concedes her "tone would have been better if I had not been suffering from a migraine."  (*Id.* at 3).  Plaintiff also concedes she "constantly interrupted" the customer's wife as his wife was trying to speak.  (Doc.

31-2 at 23-24).   According to Plaintiff, she was concerned some disciplinary action would be taken, but Insignares said she "didn't know what would happen."  (Doc. 31-2 at 26).

On Monday, January 14, 2013, at 5:00 p.m., Insignares sent an email to several people asking them to review the January 11 call and the follow-up call.  In this email, Insignares stated:

> Martha was on a written BCOC for rude behavior towards a customer about 1 ½ years ago.  She is also under medication that may have impacted her judgment and behavior on this call.  I've done due diligence and offered her a [Workplace Arrangement] (pending review from HR/Unplanned Leave Team).   With the recent heightened levels of accountability in addressing released calls, rudeness or any other behavior that is not aligned with our Code of Conduct, I would recommend that we make a collaborative decision on this situation.  We will need to consider how we've recently handled frontline employees for rudeness and released calls.  In addition, Martha is held to higher standards for being a Leader of the business.

(Doc. 31-8 at 58).

At 6:24 a.m. on January 15, 2013, Plaintiff sent an email to Insignares in which she stated, "I just wanted to let you know that although I am here today I still have a very bad headache and did not rest well last night."  (Doc. 31-8 at 65).  Plaintiff continued, "I am still very upset over our conversation and the pending results, it has me in great emotional upheaval." (*Id.*).  Also on January 15, 2013, Plaintiff completed a Workplace Arrangement Request Form. (Doc. 31-8 at 60).   On the form, she states it is "[d]ifficult to process daily tasks when experiencing a migraine headache and under medication."  (*Id.*).  She requests the "[a]bility to have time off to deal w[ith] headaches (up to 2-3 days a month) and any doctors' appointments related to these issues."  (*Id.*).  On January 17, 2013, Plaintiff's doctor signed a form which states he advised her to stop working on January 14, 2013.  (*Id.* at 62).

In an email dated January 17, 2013, HR Manager Bridgette Wilder wrote to Insignares, "As a follow-up to our meeting, when can I anticipate the review for separation document." (Doc. 31-8 at 72).  This email was copied to Knight.  Later that day, Insignares responded:

"Attached is the NEA HR Admin. Review for Separation form & Written BCOC from 9/19/2011.  Let me know if there's anything else you need." (*Id.*).  On January 21, 2013, Knight replied to this thread and requested that the "separation document" be edited down so that it would be "more crisp."   Knight suggested summarizing emails rather than including them in their entirety.  (*Id.* at 71-2).   On January 22, 2013, Knight followed up, asking Wilder, "Bridgette, do you now have the revisions you need to move forward with this warning?  I want to move quickly with this separation." (*Id.* at 71).  Wilder responded that she was waiting on revisions from Insignares, and Insignares appears to have provided a completed copy of the "separation document."  (*Id.* at 70-71).  Finally, Wilder wrote to two other employees in the human resources department:

> I'm forwarding a review for separation for a supervisor, Martha Moore.  She had previously received a WW for customer rudeness in 2011 that has expired.  I listened to the triggering event call and there were some opportunities that she could have eliminated the escalation…
>
> Per the AD, the employee acknowledged that this was a bad call.
>
> I need to review the sidebar matter of a recently approved [Workplace Arrangement] as part of this review.  Val is the primary consultant on this one so [*sic*] and also manages the [Workplace Arrangement] process so can provide relevant detail if I am not available. …
>
> Also, note the supervisor has open[ed] an FML claim today.

(Doc. 31-8 at 70).

 Plaintiff filed for FMLA leave on January 22, 2013.  (Doc. 31-2 at 27).  An email from Wilder indicates Plaintiff's request for accommodation was "recently approved" as of that same date.  (Doc. 31-8 at 70).   Another email indicates that as of January 24, 2013, Plaintiff's accommodation request was approved in the form of an anti-glare filter for her computer monitor.  (Doc. 31-8 at 69).  Plaintiff stated in an email to Human Resources personnel that she

had "opened a claim" for medical leave as of January 22, 2013.  Plaintiff was formally terminated on January 25, 2013.  (*Id.*).

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "Rule 56(c) mandates the entry of judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving for summary judgment always bears the initial burden of proving the absence of a genuine issue of material fact.  *Id.* at 323.  Once the moving party has met its burden, then the non-moving party must "go beyond the pleadings" and point to specific facts in the record to show there is a genuine issue for trial.  *Id.* at 324 (citation omitted).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 249).  The court must "examine the evidence in the light most favorable to the non-moving party," drawing all inferences in favor of such party.  *Earl Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000).  Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts.  *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes

in the non-moving party's favor when that party's version of the events is supported by insufficient evidence.).   However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."   *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citation omitted).

## III.   DISCUSSION

### A.   Time-Barred Claims

As an initial matter, Defendant argues any FMLA claims based upon conduct predating November 18, 2012, and any ADA claims based upon conduct predating September 17, 2012, are untimely.   The FMLA's statutory limitation period is two years.   29 U.S.C. § 2617(c).   To bring a timely claim for discrimination under the ADA, a plaintiff must exhaust administrative remedies by filing a charge of discrimination with the EEOC within 180 days of the challenged employment practice.   *Rizo v. Ala. Dept. Human Res.*, 228 Fed. App'x 832, 835 (11th Cir. 2007) (citing *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1241 n.2, 1220 (11th Cir. 2001)). Plaintiff filed her charge of discrimination on March 16, 2013 (Doc. 1-1), and her complaint was filed on November 18, 2014 (Doc. 1).   Therefore, Defendant is correct in its calculation that any FMLA claims which accrued prior to November 18, 2012, and any ADA claims based upon conduct predating September 17, 2012, are barred by the limitations periods.

Plaintiff's ADA claims clearly rest on her termination, which occurred on January 25, 2013.   (Doc. 1 at ¶¶ 96, 97).   Plaintiff does not assert any ADA claim based upon conduct which predated September 17, 2012.   Accordingly, Defendant's motion is due to be denied insofar as it is based upon a limitations period affecting ADA claims.

As to her FMLA claims, Plaintiff states in Count Three: "Defendant terminated Plaintiff before she had used the leave to which she was entitled.   … Defendant had a history of

interfering with Plaintiff's FMLA rights." (*Id.* at ¶ 98). In Count Four, Plaintiff states: "Although Plaintiff was approved for FMLA intermittent leave, she was terminated shortly after making the FMLA request. … Defendant had a history of retaliating or attempting to retaliate against Plaintiff for exercising her rights under the FMLA." (*Id.* at ¶ 99). To the extent Plaintiff asserts any FMLA claims based upon conduct that predates November 18, 2012, Defendant's motion for summary judgment is due to be granted. However, the court reads these counts as identifying Plaintiff's termination on January 25, 2013, as the prohibited conduct about which she complains. To the extent she refers to conduct preceding her termination, it is to point out evidence of Defendant's knowledge, motive, or intent to interfere or retaliate—not actionable incidents of such conduct. Therefore, the court construes the complaint as asserting FMLA claims only on the basis of Plaintiff's termination. Accordingly, Defendant's motion for summary judgment is due to be denied insofar as it is based upon the FMLA's statute of limitations.

### B. Discriminatory Termination In Violation Of The ADA

Plaintiff alleges Defendant wrongfully terminated her on the basis of her disability and under the pretext that she committed misconduct during the January 11 call. The ADA provides that "no [employer] shall discriminate against a qualified individual with a disability because of the disability of the individual." 42 U.S.C. § 12112(a). Where there is no direct evidence of an intent to discriminate on the basis of a disability, the court analyzes the facts under the *McDonnell-Douglas* burden-shifting framework. *Durley v. APAC, Inc.*, 236 F.3d 651, 655-57 (11th Cir. 2000); *see also McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973). To establish a *prima facie* case of disability discrimination, Plaintiff may show that (1) she is disabled, (2) she was qualified to perform her job, and (3) she was subjected to an adverse

employment action because of her disability.  *Cleveland v. Home Shopping Network, Inc.,* 369 F.3d 1189, 1193 (11th Cir. 2004).

Defendant argues Plaintiff cannot make a *prima facie* case of discrimination because she cannot show she was terminated "because of" her disability—that is, she cannot establish the causation prong of a *prima facie* case.[1]  *Cleveland*, 369 F.3d at 1193.  Regarding the standard of causation, "whether a mixed motive theory is cognizable under the ADA is still an open question in this circuit."  *Parsons v. First Quality Retail Svcs., LLC*, 2012 WL 174829, *8 (M.D. Ga. Jan. 20, 2012).  However, multiple other appeals courts have decided the "but for" causation framework applies in the ADA context.  *July v. Bd. of Water and Sewer Com'rs of City of Mobile*, 2012 WL 5966637 (S.D. Ala. Nov. 29, 2012) (collecting authority).  Another judge sitting in this district recently found ADA discrimination claims to be subject to a "but-for" causation standard on the same reasoning cited by other circuits.  *Savage v. Secure First Cred. Union*, 107 F. Supp. 3d. 1212, 1216-17 (N.D. Ala. May 8, 2015), *rev'd on other grounds*, Slip Op., No. 15-12704 (11th Cir. May 25, 2016).  This court finds the reasoning of *Savage* and the decisions in other circuits to be persuasive and finds the "but for" causation standard applies to this claim.

The evidence submitted clearly establishes that the January 11 call—not Plaintiff's disability or request for accommodation—was the precipitating event for discussions about whether to terminate Plaintiff.  Plaintiff says her disability was known starting in December

---

[1] Defendant does not appear to dispute whether Plaintiff is able to make a showing under the first two prongs of the test for a *prima facie* case.  To the extent there is a dispute as to whether Plaintiff is disabled or was regarded as having a disability, Plaintiff has testified she complained about her migraines to Insignares starting in December 2012.  Further, she has stated migraines caused symptoms which substantially limited major life activities such as speaking and walking.  Accordingly, she has presented evidence sufficient to create a factual dispute and defeat summary judgment as to the first two prongs of a *prima facie* ADA discrimination claim.

2012, but no action was taken against her at that time.  The flurry of activity leading to her dismissal clearly began on January 11, 2013, from the moment the customer called to complain.  Further, Knight and Wilder were involved in the discussions about terminating Plaintiff on January 11, 2013 (before Plaintiff's discussion with Insignares about her migraine medication and the possibility of seeking an accommodation).  Plaintiff makes no allegation that Knight or Wilder had any knowledge of Plaintiff's migraines in advance of their concern regarding the January 11 call and Knight's suggestion that it might warrant termination.  The undisputed facts show Plaintiff's various requests for accommodation were honored over the years.  This record of accommodation cuts against Plaintiff's assertion that she was terminated because of her disability, which she acknowledges was not the subject of any formal notice or request for accommodation until after her termination was being considered.

There is a dispute as to whether Insignares understood Plaintiff's headaches to be migraines.  But even assuming Plaintiff's submissions are sufficient to establish that her disability was known to Insignares before termination was considered, nothing points to her disability as a motivating factor.  Insignares stated from the outset that, in addition to having been cited previously for rudeness during a customer call, Plaintiff was "also under medication that may have impacted her judgment and behavior on this call."  (Doc. 31-8 at 58).  On this basis, Plaintiff was counseled to apply for an accommodation and approval for FMLA leave.  At most, this evidence could allow a jury to infer Defendant's disability was considered at the same time as Plaintiff's conduct on the January 11 call.  However, misconduct may serve as a basis for termination even where the misconduct is caused by a qualifying disability.  *See, e.g.*, *Miners v. Cargill Comm., Inc.*, 113 F.3d 820 (8th Cir. 1997), *cert. denied*, 522 U.S. 981 (although alcoholism qualifies as disability under ADA, alcoholics or perceived addicts are not protected

from the consequences of alcohol-related misconduct); *Burch v. Coca-Cola, Inc.*, 119 F.3d 305 (5th Cir. 1997), *cert. denied*, 522 U.S. 1084 (same).

Plaintiff argues her termination was not finalized until after her disability was formally announced and she sought an accommodation on that basis. But Plaintiff states she first discussed her migraines with Insignares in December 2012, and even accepting this description of events, Defendant took no action against Plaintiff until the customer call which Plaintiff acknowledges mishandling. (Doc. 33 at 32).[2] Nothing following her formal initiation of a leave and accommodation request suggests she was suddenly scrutinized more closely or that her request changed the conversation about her potential termination in any way.

Even if Plaintiff's claim were considered using the more forgiving "mixed-motive" causation standard, Defendant would be entitled to summary judgment. Plaintiff attempts to prove causation by showing Defendant deviated from its own standard procedures in terminating Plaintiff because it considered an outdated infraction. An employer's deviation from its own standard procedures may serve as evidence that its stated reason for firing a plaintiff was cover for discrimination. *See Bass v. Bd. of Cty. Com'rs of Orange Cty., Fla.*, 256 F.3d 1095, 1108 (11th Cir. 2001) (stating that employer's violation of its own hiring procedure could be evidence of pretext). But Plaintiff has not shown any policy by which Defendant restricted itself from considering prior incidents in disciplinary actions. It is true that in an email Bridgette Wilder referred to one of Plaintiff's prior infractions as "expired." At most, this would support the

---

[2] Plaintiff does allege in her response brief that "Insignares knew in December 2012 that Plaintiff was suffering from migraines and never suggested an accommodation until January 14, 2013." (Doc. 33 at 9). The regulations promulgated pursuant to the ADA state that an employer may in some circumstances need to "initiate an informal, interactive process" with a disabled employee to establish an appropriate accommodation. 29 C.F.R. § 1630.2(o)(3). Because Plaintiff asserts an ADA claim for discriminatory termination, not a claim of discrimination for Defendant's failure to accommodate her disability, this assertion does not change the analysis of Plaintiff's claims. (Doc. 1 at 11-12).

assertion that Defendant was not *required* to terminate Plaintiff according to its own policies. This is not the same as showing Defendant *could not* terminate Plaintiff based on a previous infraction.

Further, Plaintiff urges she was treated differently from identical comparators who were given warnings rather than being fired subject to a "zero tolerance" policy. The court accepts Plaintiff's assertion these comparators are valid, but these examples do not show Plaintiff was treated worse than any other employee. The evidence shows Plaintiff was given more than one chance after having been rude to a customer during a call. Thus, it does not appear Plaintiff was subjected to a "zero tolerance" policy. If she were, she would have presumably been terminated earlier. The evidence shows Plaintiff was granted accommodations and FMLA leave before and after previous incidents of rudeness for which she was reprimanded. The court finds Plaintiff has failed to raise a factual dispute as to whether these examples represent comparators who were treated better than Plaintiff. Therefore, Plaintiff's submission of comparator evidence does not change the court's finding that she has failed to raise a factual dispute as to whether her disability was the cause of her termination.

Plaintiff has failed to raise a genuine issue of material fact as to whether her termination was "because of" her disability. Accordingly, she has failed to establish a required element of here ADA discrimination claim, and Defendant is entitled to summary judgment.

### C.  Retaliatory Termination In Violation Of The ADA And The FMLA

The ADA prohibits retaliation against an individual for engaging in protected activity. 42 U.S.C. § 12203(a). To prevail on her ADA retaliation claim, Plaintiff must show that: (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the two. *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir.

2016) (citing *Lucas v. W.W. Granger, Inc.*, 257 F.3d 1249, 1260-61 (11th Cir. 2001)).  A request for a reasonable accommodation is protected activity as contemplated under the first element.  *Id.* (citing *Standard v. A.B.E.L. Svcs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998)).  The Supreme Court has expressly held that ADA retaliation claims are subject to the "but-for" causation standard.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

To state a *prima facie* case of FMLA retaliation, a plaintiff must show (1) she engaged in statutorily protected conduct, (2) she suffered an adverse employment action, and (3) there is a causal connection between the two.  *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010).  The "but-for" causation standard has not yet been expressly applied by the Eleventh Circuit to FMLA retaliation cases, but another judge in this district recently applied this standard in an FMLA retaliation case.  *Jones v. Allstate Ins. Co.*, 2016 WL 4259753 *4 (N.D. Ala. Aug. 12, 2016).  The undersigned finds the reasoning of *Jones* to be persuasive and will apply the same standard to the instant case.

Plaintiff has established the first two elements of a *prima facie* case by showing she requested an accommodation for her disability and FMLA leave on January 15, 2013, and was terminated shortly thereafter.  Regarding causation, the evidence makes clear several decisionmakers were actively discussing how to handle Plaintiff's misconduct before she requested an accommodation or leave and Plaintiff's employment was in jeopardy.  At the end of the meeting in which Insignares confronted Plaintiff about the January 11 call, Insignares said she "did not know what would happen" with regard to Plaintiff's termination.  In an email to Knight and Wilder on January 14, 2013, Insignares noted Plaintiff had previously been disciplined for rudeness toward a customer and pointed to "recent heightened levels of accountability in addressing … rudeness or any other behavior that is not aligned with our Code

of Conduct." (Doc. 31-8 at 73). Insignares also noted, "Martha is held to higher standards for being a Leader of the business." (*Id.*). Insignares pointed out that she had encouraged Plaintiff to seek accommodation for her medical complaints and suggested the group consider how they had recently treated other incidents of rudeness. This email, sent almost contemporaneously with the meeting between Plaintiff and Insignares, shows a consideration of all the factors surrounding Plaintiff's conduct, including Plaintiff's claim to have been in so much pain she was unable to speak. Therefore, it is impossible for Plaintiff to show that her request – either for accommodation or FMLA leave – was a "but-for" cause of her termination, given that another cause (her misconduct) was already in play by the time her requests came into existence.

Moreover, even if Plaintiff were not required to meet a "but-for" causation standard, the requirement that she show something more than temporal proximity in establishing causation is fatal to her claim. The Eleventh Circuit has held: "[I]n a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). To add something beyond temporal proximity, Plaintiff points to comparators who were supposedly treated better than Plaintiff in that they were not terminated after their first offense. But this ignores the fact that Plaintiff, too, was afforded more than one chance. She was cited for misconduct in relation to the June 2011 and September 2011 incidents. As discussed above in section III.B, Plaintiff attempts to avoid this point by arguing that her earlier citation for these incidents had "expired" by the January 11 call. It is true the 2011 write-ups were described as "expired" in an email among the decisionmakers. (Doc. 31-8 at 70). However, this serves only

to show that Defendant was not *required* to terminate her on the basis of the January 11 call; it does nothing to suggest that Defendant *could not* terminate her for cause on that basis.

Plaintiff's arguments amount to an assertion that she is entitled to a judgment because Defendant considered her request for leave and accommodation after it began to follow through on the decision to fire her.  Several documents make clear Defendant's disability was known to the decisionmakers who were affording Plaintiff the proper review before her termination was finalized, and nothing in the record suggests anyone tried to hide the fact they were aware of Plaintiff's circumstances.  Plaintiff has provided no authority, and the court has found none, for the proposition that an employer renders itself unable to terminate an employee for cause by considering Plaintiff's circumstances (including requests for leave or accommodation) when simultaneously contemplating termination on legitimate grounds.

Because Plaintiff's requests only came about after Plaintiff was already well along in the process of being terminated for cause following her misconduct on the January 11 call, she cannot show her requests were the "but-for" cause of her termination, and she cannot rely on temporal proximity alone in establishing causation by any standard.  Because she has raised no other genuine issue of fact with regard to causation, Defendant is entitled to summary judgment as to Plaintiff's retaliation claims.

### D.  Interference With FMLA Right

The FMLA makes it illegal for any employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided under the statute.  29 U.S.C. § 2615(a)(1).  A plaintiff claiming interference must demonstrate by a preponderance of the evidence that she was denied a benefit to which she was entitled.  *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1274 (11th Cir. 2012).

Plaintiff asserts this claim on the grounds that she was denied the exercise of her right to take the leave which was approved prior to her termination.  As with Plaintiff's other claims, Defendant's pre-existing and independent reason for terminating her is fatal.  "[T]he right to commence FMLA leave is not absolute, and [] an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave."  *Krutzig*, 602 F.3d at 1236.  For the same reasons described above, the court finds Plaintiff is unable to support her claim for FMLA interference because her termination was precipitated by a legitimate cause unrelated to her request for leave.  Accordingly, Defendant's motion for summary judgment is due to be granted as to Plaintiff's claim of interference with a right conferred by the FMLA.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned finds Plaintiff has failed to raise any genuine issue of material fact.  Accordingly, Defendant's motion for summary judgment (Doc. 28) is due to be granted as to all claims.  A separate order will be entered.

**DONE** this 31st day of March, 2017.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE